[Crim. No. 1938. In Bank.—September 1, 1915.]

## THE PEOPLE, Respondent, v. LAWRENCE COUTCURE, Appellant.

CRIMINAL LAW—MURDER—VERDICT JUSTIFIED BY EVIDENCE.—In this prosecution for murder, it is held that while the accounts of the tragedy which were given by the various witnesses differed in many particulars, there was ample evidence to justify the verdict if the jurors believed the statements of the witnesses for the people.

ID.—EVIDENCE—IMPEACHMENT OF DEFENDANT—STATEMENTS MADE IN INTERVIEW WITH OFFICERS—USE ON CROSS-EXAMINATION—PROPER PRACTICE.—In such a prosecution, it is not an objectionable mode of procedure, but one quite in accordance with the usual practice as provided by section 2052 of the Code of Civil Procedure, to permit the district attorney upon the cross-examination of the defendant to ask him a number of impeaching questions based upon an interview between the defendant, a deputy sheriff and the district attorney in the presence of a phonographic reporter, where it is shown that the defendant was fully advised of his rights before such interview was had,

Id.—Evidence—Threats of Defendant—Conflict of Testimony—Duty of Jury—Appeal.—Where the evidence is conflicting as to whether or not the defendant had uttered threats against the deceased, it is the duty of the jurors, under proper instructions, to determine the fact from the conflicting testimony, and the appellate court has no power to set aside their conclusions so reached.

Id.—Proof of Interview — Testimony of Reporter — Introduction After Testimony of Defendant — Proper Refusal to Strike Out.—Where in such a prosecution, the phonographic reporter is called to testify that the defendant had given the answers indicated by the impeaching questions, it is not error to refuse to strike out such testimony on the ground that it should have been received, if at all, as a part of the prosecution's main case, as such witness was only called for the purpose of impeachment.

Id.—Direct Examination of Reporter—Proof of Parts of Interview—Narration of Entire Conversation—Order Properly Refused. Where the testimony of such reporter upon his direct examination is confined to the giving of parts only of the interview, it is not error to refuse to order that he read his notes of the entire conversation, part of which was given upon his direct examination.

Id.—Private Memoranda of District Attorney—Filing as Exhibit—Requested Order Properly Refused.—The refusal of the court to order the district attorney to file as an exhibit the paper which he was using as a memorandum in framing his questions to the defendant concerning the conversation held shortly after the latter's arrest, is not error, where it was stated that the writing contained such officer's private memoranda of the interview and it was offered to opposing counsel for inspection.

Id.—Impeachment of Defendant — Rebuttal Testimony — Threats Against Deceased.—It is proper in such a prosecution after the denial by the defendant that he ever made any threats against the deceased, to permit the state to prove the contrary by the witness to whom such threats were made, although such testimony might have been introduced by the prosecution as part of its case in chief for the purpose of showing malice.

Id.—Misconduct of District Attorney—Defendant not Prejudiced.—It is held herein that after a careful consideration of all of the instances of the district attorney's alleged misconduct, that neither singly nor in the aggregate, they present any reason for a reversal of the judgment or of the order refusing a new trial.

APPEAL from a judgment of the Superior Court of San Luis Obispo County, and from an order denying a new trial. T. A. Norton, Judge.

The facts are stated in the opinion of the court.

Thomas Rhodes, for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and C. A. Palmer, District Attorney, for Respondent.

MELVIN, J.—The defendant was convicted of the crime of murder of the first degree. His motion for a new trial was denied and he was sentenced to suffer the death penalty. He appeals from the judgment and from the order denying his motion for a new trial.

That the defendant shot and killed Don W. Sullivan, a human being, and at about the same time shot and wounded August Nyeberg at the latter's house are undisputed facts fully admitted by the defendant who at the trial while testifying as a witness in his own behalf freely stated that he shot both men. The accounts of the tragedy which were given by the various witnesses differed in many particulars, but there was ample evidence to justify the verdict if the jurors believed the statements of the witnesses for the people. Indeed a great part of the testimony presented the defendant as a willful, deliberate murderer who armed himself and sought out his victims with intent to kill.

It is undisputed that the defendant had been engaged by August Nyeberg as a cook for the men who had been employed by Nyeberg in performing certain contract work in connection with road building and the construction of a bridge; that Coutcure had been paid off and his term of employment has ceased; and that he went to the house of his former employer, Nyeberg, on the afternoon of the 25th of September, 1914. It is also undoubtedly true that during his visit he had a quarrel with Nyeberg, due to a discussion of the theft of certain provisions from the former's construction camp and that as a result Coutcure was ordered to leave and did leave the premises. The defendant denied the statement made by Mrs. Nyeberg that during his visit to her home in the afternoon he had uttered threats against Sullivan, and he also denied that he had told Mr. Nyeberg of his intention to harm Sullivan, although it was in evidence that he had made such declarations to Nyeberg. It was the duty of the jurors, under proper instructions, to determine the facts from the conflicting testimony and we have no

power to set aside their conclusions so reached. Defendant admitted that he purchased a revolver on the afternoon of the homicide shortly before he went to the home of the Nyebergs, and that he used said revolver in accomplishing the death of Sullivan. He also testified that on the way to the residence of his former employer he met and talked with William Gregory but their stories of what occurred at that interview were vastly different. The defendant declared that during this conversation he uttered no threats and voiced no intention of doing harm to anyone. Gregory testified that the defendant threateningly displayed a revolver, and after inquiring if Gus Nyeberg and Sullivan were at the house, and receiving an affirmative reply, he declared his intention of killing the whole family. Gregory also said, while on the witness-stand, that as soon as Coutcure left him, he appealed to Charles Cliff, a bridge inspector, to help him to warn the people in Nyeberg's house. Coutcure denied on the witness-stand that he had displayed a revolver during his conversation with Gregory, or that the latter had patted him on the shoulder in an effort to pacify him; but it appeared from the testimony of the phonographic reporter who took notes of a conversation between the defendant, the district attorney, and others which occurred shortly after Coutcure's arrest, that the defendant at that time admitted showing the revolver to Gregory. Cliff corroborated Gregory in important particulars. He saw the men while they talked and heard no part of their conversation, but he did see Gregory patting Coutcure on the shoulder. It does not appear from his testimony what, if anything, was said to him by Gregory after Coutcure resumed his journey toward the house, but Cliff did testify that he had started to his camp, a few steps away, for the purpose of procuring a weapon, before the defendant reached the front door of Nyeberg's house which was distant about sixty paces from the bridge. This tends to corroborate the statement of Gregory who had testified without objection, that when he informed Cliff, the bridge inspector, of Coutcure's murderous design, Cliff said "I will run and get the gun."

In the accounts of the actual killing there were the usual variations which occur when witnesses attempt to describe an exciting event. The stories told by the witnesses for the prosecution agreed in substance, and the defendant corrobo-

rated them in such matters as the number of the shots fired and the places where the wounded men fell. According to the testimony of August Nyeberg, he was seated at the supper table with his wife, his brother Charles, and Sullivan. They had about finished their meal and two of the workmen who had eaten with them had left the house. There was a knock at the front door and both August Nyeberg and his wife started toward it. He arrived first and opened the door. He there saw the defendant standing about three feet away with the revolver leveled at him. Coutcure exclaimed: "I come up to kill you fellows." Nyeberg cried: "For God's sake, don't shoot anybody." Then Sullivan came up to the door and the defendant fired two shots at him, exclaiming, just as he discharged the revolver, "You are the son-of-a-bitch I want." Sullivan, mortally wounded, fell outside the door and another shot was fired by Coutcure. This struck the floor of the porch near the dying man. The fourth shot was fired at Nyeberg, taking effect in his body, and his wife then, after pulling him backward, slammed the door. Mrs. Nyeberg corroborated this testimony in the matters of the defendant's position when the door was opened, his remark to Sullivan as the latter ran forward, the firing of the four shots and her slamming of the door after her husband was wounded. Charles Nyeberg corroborated the prosecution's other witnesses in their accounts of the shooting, except that he said he was not in a position to see the person who spoke outside the door and later fired the four shots.

Defendant testified that on the occasion of his visit to Nyeberg's house in the afternoon, the latter brutally accused him of stealing supplies from the camp and ordered him away from the place. According to his story, he went back to his room in Paso Robles, just across the river, and after thinking over the accusations which had been made against him, fearing that Nyeberg would cause his arrest, he decided to return and to attempt to convince Nyeberg of his innocence. Arriving at the house he was alarmed, he said, at the manner of Sullivan, who rushed toward him, and fearing an attack by Sullivan with a knife (although he saw no weapon of any kind) he shot the advancing man in order to protect himself, and through like fear of bodily injury he shot August Nyeberg.

On cross-examination of the defendant the district attorney asked a number of impeaching questions, based upon an interview between Coutcure, a deputy sheriff and the district attorney in the presence of a phonographic reporter. Defendant's counsel made frequent and vigorous objections upon the ground that the prosecuting officer was endeavoring to introduce a confession without laying the necessary foundation, and upon the further ground that the statements attributed to Coutcure were extorted from him by taking him from his cell in a half-dressed condition in the nighttime and applying the methods of the so-called "third degree." The phonographic reporter was afterwards called and testified that the defendant had given the answers indicated by the impeaching questions. While the defendant did say that he was under great fear while he was talking with the district attorney and the deputy sheriff, he related no circumstances tending to show necessarily that his fear was justified. On the other hand, the prosecution introduced testimony of a statement by the district attorney to Coutcure in which the latter was fully advised of his rights. He was told the official positions of the officers present and the prosecutor, according to the testimony, further said to him: "You understand you don't have to make any statement unless you want to. If you care to make any statement I will be glad to have you make it, but whatever you say at this time, if it is against you, will be used against you later on; if it is in your favor it can be used in your favor. I don't want any statement unless it is absolutely voluntary, and I don't want any unless you tell the truth. Do you care to make any statement at this time? If you do it must be voluntary on your part."

It was not pretended that the conversation following this admonition amounted to a confession, but the prosecutor sought to use parts of it for the purposes of impeachment of certain statements made by the defendant when he testified at the trial. We can see no objection to this method of procedure. It seems to have been quite in accordance with the usual practice as provided by section 2052 of the Code of Civil Procedure.

When the phonographic reporter (who had refreshed his recollection by use of his notes) had concluded his testimony upon direct examination, defendant's counsel moved to strike

it out on several grounds, among them being that it should have been received, if at all, as a part of the prosecution's main case. This objection was without merit. The witness was called only for purposes of impeachment, and obviously the prosecution was not in a position to impeach the testimony of one who had not spoken. Therefore the witness was properly called after the defendant had testified. Counsel for the defendant also asked the court to make an order that the witness read his notes of the entire conversation of which he had given parts. The court refused to make such an order and the refusal is specified as error, but we know of no rule of law requiring a court to make such an order. Of course it would have been proper for counsel to interrogate the witness, upon cross-examination, with reference to those parts of the conversation on the same subject which he had not detailed in his direct examination (Code Civ. Proc., sec. 1854), but no such cross-examination was attempted. It was not the duty of the court either of its own motion, or upon request of counsel, to order the witness to narrate the entire conversation.

Defendant stated that he had never had any trouble with Sullivan. He was asked concerning certain alleged conversations with Nyeberg in which he had expressed the intention of thrashing Sullivan. He denied that he had ever made such threats. Nyeberg was called and testified that Coutcure had made the statements involved in the impeaching questions. Objection was made to this testimony on the ground that it was part of the prosecution's case in chief and might not be introduced by way of rebuttal. While it might have been offered for the purpose of showing malice and for that purpose might have been introduced by the prosecution originally, it was none the less pertinent and proper as impeachment of defendant's declaration that he had never had any trouble with Sullivan and had never harbored any ill feeling against the deceased.

Nor was it error for the court to refuse to order the district attorney to file as an exhibit the paper which he was using as an aid in framing his questions to the defendant concerning the conversation held shortly after the latter's arrest. The prosecutor stated that the writing contained his private memoranda of the interview and offered it to opposing counsel for inspection. This was all that the de-

CLXXI Cal.—4

fendant could in reason expect. There was no duty, in law or in morals, requiring the district attorney to file the notes of his talk with Coutcure.

Defendant's counsel insists that the prosecuting officer was guilty of such misconduct as deprived the defendant of a fair and impartial trial. He cites instances of the alleged unfairness of the district attorney. Some of these citations refer to questions either insinuating that the defendant, who was under cross-examination, was not telling the truth, or assuming that he had lied upon other occasions about which he had testified. In some instances these questions were asked without objection and were answered without protest. When objection was made the court promptly sustained it and admonished the district attorney. This occurred after the defendant had described his meeting with Gregory and had stated that the latter had felt his coat and praised its quality while they were conversing at the bridge a few moments before the homicide. The district attorney asked the following question: "Mr. Coutcure, don't you know that you are lying when you state that to the jury?"

Defendant's counsel took prompt exception to the question (which had been answered) and asked the court to admonish the district attorney. This was done and the court not only stated that the form of the question was improper but told the jurors that theirs was the peculiar prerogative of passing upon the credibility of a witness.

Several objections were made to statements of the district attorney in his argument to the jury. He referred to Coutcure as: "A man who has repudiated his ancestors by denying their name, and traveling about the country under an assumed name, Larry Gibbons." He said: "I despise a man who disowns his parents and his country by taking up an assumed name." Instant objection was made by counsel for the defendant and the court said: "I don't think there is' any such language in the record, the jury are to disregard any statement of that kind, the argument is not justified by the evidence." We are convinced that the court's admonition prevented any injury to the defendant.

Coutcure had been using an assumed name, adopted, as he said, because of the difficulty experienced by his fellow workmen in pronouncing his real name. Therefore he was not injured by the statement of the *fact* of his assumption of an

*alias.* The vice lay in the conclusions which the district at-
torney sought to draw from the circumstance and this was
removed by the prompt admonition which the court gave to
the jury.

In his argument to the jury the district attorney said that
Coutcure "got the two men he told William Gregory he was
after," and suggested that if Charles Nyeberg had come for-
ward to aid Sullivan, the wounded man, Coutcure would have
shot him, too, and that the defendant would have shot Mrs.
Nyeberg if she had come any farther, especially if her hands
had been behind her. This was improper argument, but it
was not altogether without support in the evidence. On cross-
examination the defendant had been asked, without objection,
why he had not shot the third man who was in the room when
he reached Nyeberg's place. He answered:

"Because he stopped or I would. If he had come out on
the porch, the chances I would." However, in answer to the
question, "You would have shot Mrs. Nyeberg?" he replied:
"I wouldn't have shot a woman in my life, and nobody else
unless I had to." Doubtless the district attorney had in
mind, at the argument, the statement of Coutcure that he shot
Sullivan, against whom, he said, he bore no grudge, because
he feared that Sullivan's concealed hand contained a weapon,
but it was not the privilege of the prosecutor to comment upon
those things which the defendant *might* have done. Cout-
cure was on trial for what he *had* done and speculation with
reference to his possible conduct under given circumstances
was out of place. But the comments of the district attorney
did not amount to serious misconduct. That which he said
about Charles Nyeberg's fate, if the latter had advanced, was
based upon testimony which, although irrelevant, had been
admitted without objection and there was a slight basis for
the comment regarding Mrs. Nyeberg. Under these circum-
stances the defendant was not materially injured by that part
of the argument.

The remark of the district attorney during the argument
to the effect that Coutcure "lied to get the pistol," was legiti-
mate and was based upon the evidence. The defendant had
related on direct examination the purchase of the revolver,
and upon cross-examination had said that he did not lie to
the gunsmith when he purchased the weapon. The testimony
of the reporter, however (which was introduced after the

proper foundation had been laid), was that in the conversation with the officers after his arrest Coutcure admitted that he had lied to the gunsmith at the time of the purchase of the revolver, because otherwise the man would not have sold it. It was very important for the jurors to consider whether Coutcure purchased the deadly weapon merely because he was about to go on a journey (which was the reason stated by him in court), or because he intended to use it as an instrument of vengeance upon Nyeberg and Sullivan. It was therefore proper for the prosecutor to address the jury upon the subject of his theory that the revolver had been bought for a sinister purpose, and to support his belief in that regard by citing the evidence to the effect that Coutcure's anxiety to possess the weapon was so great as to make him lie for the sake of getting it. We cannot say, after a careful consideration of all of the instances of the district attorney's alleged misconduct, that either singly or in the aggregate they present any reason for a reversal of the judgment or of the order of the superior court refusing a new trial.

No formal criticism of the instructions appears in the briefs of appellant, but nevertheless we have carefully examined the charge to the jury and we find no substantial error.

The judgment and order are affirmed.

Shaw, J., Sloss, J., Lawlor, J., Lorigan, J., and Angellotti, C. J., concurred.